# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
## No. 18-1319V
UNPUBLISHED

| | |
|---|---|
| BRITTANY MORELAND,<br><br>                Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>             Respondent. | Chief Special Master Corcoran<br><br>Filed: September 2, 2022<br><br>Special Processing Unit (SPU); Reconsideration; Decision Awarding Damages; Pain and Suffering; Lost Wages; Influenza (Flu) Vaccine; Shoulder Injury Related to Vaccine Administration (SIRVA) |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Debra A. Filteau Begley, U.S. Department of Justice, Washington, DC, for Respondent.*

## DECISION AFTER RECONSIDERATION AWARDING DAMAGES[1]

On August 28, 2018, Brittany Moreland filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered a Table Injury – Shoulder Injury Related to Vaccine Administration ("SIRVA") – as a result of an influenza ("flu") vaccine received on October 16, 2017. Petition, ECF No. 1 at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

Although entitlement was conceded, the parties could not agree on damages, so I endeavored to decide the disputed components after a brief "Motions Day" hearing, issuing a decision on June 28, 2021, memorializing my determinations. I awarded

---

[1] Because this Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

$75,000.00 for Petitioner's actual pain and suffering, but denied Petitioner's claim for lost earnings in the entirety as inadequately substantiated. ECF No. 63 (hereinafter the "Original Decision"). Thereafter, Petitioner filed (at my invitation) a Motion for Reconsideration (hereinafter "Motion") largely addressing the lost earnings issue, and I withdrew my Original Decision in order to consider Petitioner's revised arguments. ECF No. 66.

Now, after evaluation of the parties' subsequent filings, I find that Petitioner is entitled to an award of damages in the amount **$75,000.00**, **representing compensation for her actual pain and suffering.**[3] I award no amount for lost earnings, for the reasons set forth below.

## I.    Procedural History

### A.  Filing Through "Motions Day" Damages Determination

As noted above, the case was initiated in August 2018. On September 30, 2019, Respondent filed a Rule 4(c) Report in which he conceded that Petitioner was entitled to compensation. ECF No. 26. Accordingly, that same day a ruling on entitlement in Petitioner's favor issued. ECF No. 27.

The parties were unable to informally resolve the issue of damages, so a briefing schedule was set on November 25, 2020. (Non-PDF Scheduling Order issued November 25, 2020). Petitioner filed her brief on March 8, 2021, requesting that I award her $130,000.00 in compensation for actual pain and suffering, plus $1,000.00 per year for the remainder of Petitioner's life representing her future pain and suffering, and lost earnings in the amount of $81,295.00. ECF No. 47. In a brief filed on May 14, 2021, Respondent opposed this damages request, maintaining that the lesser sum of $40,000.00 to $60,000.00 for past pain and suffering was appropriate, with no award of future pain and suffering or lost earnings. ECF No. 55.[4] Petitioner filed a Reply brief on May 26, 2021. ECF No. 60.

In April of last year, I informed the parties that this case was appropriate for an expedited hearing and ruling via my "Motions Day" practice, at which time I would decide

---

[3] The instant Decision reaches the same result as the Original Decision, but includes an in-depth discussion of the proof offered by Petitioner on reconsideration.

[4] Respondent previously offered Petitioner a Proffer in the amount of $62,500.00, but recommended a lower award in his brief based on "numerous SIRVA damages decisions since that time." ECF No. 55 at 24 n.12. Likewise, Respondent notes Petitioner's demand for damages to Respondent was lower than the award requested in her brief. EFC No. 55 at 1 n.1. Petitioner explains her demand was an attempt to informally resolve damages in his case. ECF No. 60 at 7-9

the disputed damages issues based on all evidence filed to date plus whatever oral argument they wanted to make. ECF No. 48. The parties agreed, and an expedited hearing took place on May 28, 2021. ECF No. 54; Minute Entry dated May 28, 2021; Transcript of Proceedings, ECF No. 62.

I orally ruled on Petitioner's damages at that time, and my Original Decision memorialized that determination. I awarded Petitioner $75,000.00, representing compensation for her actual pain and suffering. I awarded no amount for lost earnings, however, finding that Petitioner's request was speculative and not substantiated in accordance with generally recognized actuarial principles and projections.

### B. Reconsideration and Briefing of Lost Wages Damages Component

Although I informed Petitioner during the Motions Day oral argument that the lost earnings aspect of her damages claim had been (to date) inadequately substantiated, I invited Petitioner to seek reconsideration of my overall damages award. I did so because it seemed possible that Petitioner could muster additional evidence to support her claim for lost earnings.

Petitioner accordingly moved for reconsideration on July 19, 2021, and simultaneously filed a further supplemental affidavit and a report from Kim Schleede, a structured settlement consultant. ECF Nos. 64, 65-2 (Ex. 21). I granted Petitioner's Motion and withdrew the Original Decision. ECF No. 66. Petitioner thereafter filed additional evidence in support of her Motion on August 30, 2022. ECF No. 68 (Exs. 22-25).

On September 13, 2021, Respondent filed a Status Report (after a preliminary review of Petitioner's lost earnings claim by his expert economist) requesting additional evidence to help Respondent evaluate the claim. ECF No. 70. I thereafter convened a status conference that month at the request of Petitioner's counsel, who objected to the scope and nature of Respondent's request. ECF No. 71 at 1. I explained that while I had granted Petitioner a final chance to substantiate her lost wages component in allowing reconsideration, that did not mean the goal of an expeditious resolution of this matter had been abandoned – and thus I was reluctant to allow this sub-component of the damages calculation to spiral out of control into a "side litigation." *Id.* at 2. I also observed that Petitioner had (by that date) been provided nearly four months to flesh out and substantiate her claim, and that each side must decide for itself what materials and evidence are necessary to support their position. Accordingly, I maintained the previously-set scheduling deadlines in this matter. *Id.*[5] I also warned Petitioner that if she did not

---

[5] My August 11, 2022 Order required Respondent to file a Status Report identifying any missing evidence by September 13, 2021, and to file an expert report and Response to Petitioner's Motion by October 12,

"deem it necessary to respond in detail to Respondent's request, and/or in a timely fashion, she incurs the risk that I will find (again) that she has not carried her burden of proof on this issue." *Id.*

Petitioner did not elect to file any of the evidence requested by Respondent. Thereafter, on October 12, 2021, Respondent filed a Response to Petitioner's Motion accompanied by an expert report from Patrick Kennedy, Ph.D., an economist. ECF Nos. 72, 73-1 (Ex. A).[6] On October 26, 2021, Petitioner filed a Reply to Respondent's Response, a third Supplemental Affidavit, and other additional evidence in support of her lost wages claim. ECF Nos. 74-75 (Exs. 26-27). Respondent subsequently requested that he be permitted to file a Sur-Reply with input from his expert in response to Petitioner's Reply and additional evidence. (Informal Communication dated November 4, 2021). I permitted Respondent this opportunity, thereby allowing each party the opportunity to file *two* briefs on reconsideration, but advised that no further filings or briefing would be permitted. (Non-PDF Scheduling Order issued November 4, 2021). On December 7, 2021, Respondent filed the requested Sur-Reply, a supplemental expert report, and additional evidence in support of his position. ECF Nos. 76-77 (Exs. C-D).

This matter is now ripe for resolution.

## II.    Lost Earnings Damages Component

### A.  Legal Standard

The Vaccine Act provides for recovery of "actual and anticipated loss of earnings determined in accordance with generally recognized actuarial principles and projections," where the injured party's "earning capacity is or has been impaired by reason of such person's vaccine-related injury." Section 15(a)(3)(A). The calculation of lost earnings damages must be performed in a "cautious manner 'in accordance with generally recognized principles and projections.'" *Brown v. Sec'y of Health & Hum. Servs.*, No. 00-182V, 2005 WL 2659073, at *6 (Fed. Cl. Spec. Mstr. Sept. 21, 2005) (citing Section 15(a)(3)(A)).

Compensation awarded for a petitioner's anticipated loss of earnings may not be based on speculation. *J.T. v. Sec'y of Health & Hum. Servs.*, No. 12-618V, 2015 WL

---

2021. Petitioner was permitted 14 days thereafter to file any Reply. (Non-PDF Scheduling Order issued August 11, 2021).

[6] Respondent also filed a wage loss narrative previously provided by Petitioner to Respondent. Ex. B, ECF No. 73-2. I note that this narrative (or statement), which is neither signed or dated, was previously filed by Petitioner on May 26, 2021 – and thus considered in the context of my Original Decision (which had found that this damages component was inadequately substantiated despite the inclusion of the narrative). ECF No. 58.

5954352, at *7 (Fed. Cl. Sept. 17, 2015) (indicating Section 15(a)(3)(A) "does not envision that 'anticipated loss of earnings' includes speculation" and denying to calculate lost wages on a planned business venture); *Dillenbeck v. Sec'y of Health & Hum. Servs.*, 147 Fed. Cl. 131, 139 (2020) (*citing J.T.*, 2015 WL 5954352, at *7). It necessarily follows that the Act also does not envision that any actual lost earnings awarded be speculative in nature. The United States Court of Federal Claims has "recognize[d] that the determination of compensation for lost earnings 'in accordance with generally recognized actuarial principles and projections' would likely require expert opinion evidence." *Dillenbeck*,147 Fed. Cl. at 139.

## B.  Parties' Contentions on Recovery of Lost Earnings

### 1.     Petitioner's Demand

Petitioner alleges that her SIRVA injury restricted her earning ability as a licensed realtor, and prevented her from achieving certain business goals as a real estate investor, as described below. Ex. 16 ¶¶ 3-6. Petitioner thus requests lost earnings related to these different aspects of her work, totaling $81,295.00 (ECF No. 47 at 2,13; ECF No. 60 at 1, 7) - reduced by her tax obligations to $69,086.00 (ECF No. 64 at 7 (citing Ex. 21)).

### 2.     Evidence in Support of Petitioner's Demand

a.     *Declarations/Witness Statements and Evidence* – Petitioner provided several personal declarations or affidavits, and a wage loss narrative. Exs. 5, 16, 20, 26; ECF No. 58. She also provided income tax returns from 2015 through 2020 (Exs. 17, 22), checks ("paystubs") and invoices issued from Kushner Realty, Inc in 2019 (Exs. 18-19, 23-24), lease agreements to which her businesses (identified below) were a party in 2021 (Ex. 25), three quitclaim deeds, dated December 2020, January 2021, August 2021 (Ex. 27 at 1-9), and a paid invoice from October 2021 to replace a septic system at another property (Ex. 27 at 10). Petitioner seeks lost income associated with a planned, but unrealized, house resale, or "flipping," projects, rental property business for 2018 and 2019, and unrealized real estate commissions (associated with her work as a licensed realtor) solely for the 2018 year. ECF No. 58.

These written testimonial materials by themselves are, on their face, not fully supportive of Petitioner's demand – and close scrutiny reveals some contradictions or omissions. For example, while Petitioner asserts she has been a licensed realtor for "many years" (*see* Ex. 20 ¶1), she has only submitted evidence of her income since 2015,

maintaining further that she was not able to "really start working" until 2016. ECF No. 58.[7] Accordingly, evidence of Petitioner's income history prior to the October 2017 vaccination resulting in her SIRVA injury is very limited. She does, however, appear to have earned $35,390.00 in income from real estate commissions from 2015 through 2017 (representing $4,986.00 in 2015, $22,570.00 in 2016,[8] and $7,834.00 in 2017). Ex. 17 at 6, 8, 31, 33, 64, 66; Ex. A at 2.

In a supplemental affidavit, Petitioner maintains that as a result of her SIRVA she was unable to drive the long distances "sometimes" required in her career, and that despite being a licensed realtor in two states she was restricted to one county in each state due to her injury, further decreasing her earning ability. Ex. 16 at ¶4. She thus elaborates, in her lost wages narrative, that she lost commission income she would have earned from residential real estate sales in 2018, as she was "only able to work very limited hours in 2018 due to being in physical therapy so much." ECF No. 58.

The medical record, however, is not completely consistent with Petitioner's contentions that her ability to work was significantly curtailed by her injury. For example, that record demonstrates that Petitioner engaged in only eight physical therapy sessions in 2018, and over a one-month period. Ex. 4 at 16-23. In addition, the summary of Petitioner's commissions earnings over the relevant timeframe shows significant fluctuation that occurred *independent* from her purported SIRVA limitations. Thus (as the Schleede Report establishes), in 2018 (the first full year Petitioner was struggling with her injury) she actually earned *more* in commissions than in 2015 or 2017. Ex. 21 at 1. And she earned more than *triple* in 2019 what she earned the year before despite continuing to treat for her SIRVA. *Id.* While this evidence does not negate the possibility of *greater* commission income but for the SIRVA injury, it does underscore the difficulty in separating out whether Petitioner's 2018 commission income was reduced due to her injury (in comparison to what she expected to earn), or was simply the product of other factors not related to her SIRVA.

In 2016 Petitioner purports to have started a real estate venture in partnership with her mother, "Moreland Realty, LLC" (the name of which was changed in 2017 to "MotherFlippers Realty, LLC"). Ex. 26 ¶4. This business was intended to be a "house-flipping" venture (which involved the purchase and repair of properties which Petitioner would then resell for a profit, or maintain as rental properties). *Id.* Petitioner asserts she earned $7,000.00 in 2016 related to her first successful house resale (although no

---

[7] Petitioner's wage loss narrative also indicates that "[i]n 2016 I was able to really start working as my daughter was in school part time and my real estate sales bought [sic] in $22,570." ECF No. 58.

[8] Before consideration of expenses, Petitioner's realtor income in 2016 was $23,825.00. Ex. 17 at 33; Ex. 21 at 1.

documentation has been filed to confirm it). ECF No. 58; Ex. 26 ¶2. She has asserted no other such instances, before or after vaccination, but maintains that she was "on track" to resell three houses in 2018 and six houses in 2019. ECF No. 58; Ex. 26 at ¶3. However, Petitioner ultimately elected not to proceed with this business endeavor as a result of her SIRVA,[9] and pivoted to property management (beginning a new, solely-owned business "MotherFlippers Management" in October 2018). Ex. 26 ¶4.

Petitioner further asserts that she derived income from rental properties. Thus, she avers that in 2017 she "secured" her first rental property, earning $150.00 a month as "my portion of the profit from my current rental." ECF 58. Petitioner provides no evidence, however, corroborating the receipt of income related to any rental properties *prior* to her vaccine injury. Petitioner otherwise states she was "on track" to obtain another rental property in 2018 and two more properties in 2019, before her October 2017 vaccine injury. ECF No. 58.

Petitioner demands a pre-tax lost income sum of $22,800.00 for 2018, and $45,600.00 for 2019, for lost income from house resales and rentals. The losses occurred because the kinds of property repairs needed to facilitate her resale/rental business were impossible due to her SIRVA, obligating her to hire other people to perform these tasks. Ex. 16 ¶5. Otherwise, she alleges that her SIRVA impacted her ability to buy rental properties in 2018 and for most of 2019, as "she was not physically, mentally, and emotionally ready to start buying again." *Id.* at ¶ 6. Ultimately, she decided to "shy away from house flips all together since my shoulder injury requires me to hire more people than before my vaccination which prices me out of the competition." Ex. 16 at ¶6*;* Ex. 20 at ¶¶5-6; Ex. 26. ¶3.


b.      *Petitioner's Expert Report* – To support her damages claim, Petitioner filed a report from Kim Schleede, a structured settlement consultant. Ex. 21. Ms. Schleede has worked as a structured settlement consultant since 1987, and has reviewed many lost earnings evaluations from economists and other experts. Ex. 21 at 1.

Ms. Schleede was retained in the present case to provide a calculation for past earnings loss. Ex. 21 at 1.[10] To do so, she relied upon Petitioner's 2019 wage loss narrative, tax returns from 2015-20, paystubs and commission statements from 2019, and

---

[9] Petitioner alleges that her mother also suffered a shoulder injury following a flu vaccination in 2017. Ex. 20 at ¶5. It is not evident that this injury resulted in Vaccine Act claim.

[10] Petitioner has not filed a *curriculum vitae*/resume for Ms. Schleede, but notes that she has 33 years of experience as a structured settlement consultant for which she possesses professional accreditations, has consulted with Vaccine Program petitioners over the past ten years, and provided testimony in a least one prior case. ECF No. 75 at 2, n.2 (citing *Trigueros v. Sec'y of Health & Hum. Servs.,* No. 16-1058V, 2021 WL 2767695, at *3 (Fed. Cl. May 27, 2021)).

Motherflipper's Management Lease Agreements for 2021. *Id.* Ms. Schleede details Petitioner's commission income and property management income from 2015 to 2020, relying upon Petitioner's tax documents. Ex. 21 at 1-2. Ms. Schleede also briefly summarizes Petitioner's request for lost earnings for 2018 and 2019, apparently based upon the assertions in Petitioner's wage loss narrative (ECF No. 58), and then proceeds to calculate the tax implications/offsets of Petitioner's purported lost income for 2018 and 2019 (Ex. 21 at 2-3). Based upon that calculation, Ms. Schleede concludes Petitioner's "lost income due to missed opportunities in her real estate profession, net of Federal, State and Self-Employment taxes to be $69,086[.00]." *Id.* at 3.

This written report, however, does not explain or assess whether *any* of the claimed lost wage elements were substantiated or shown to be reasonable. At most, Ms. Schleede points to Petitioner's 2020 earnings in commission income and property management, in conjunction with the lease agreements she secured in 2021, and observes that Petitioner "successfully re-focused her energies on her traditional real estate activities and the property management side of her business, highlighting her desire to be a successful real estate professional, despite the limitations the injury has placed on her physically." Ex. 21 at 2. Thus, the primary service provided by the report is factoring in the "real" value of Petitioner's alleged loss earnings after taxes – not explaining how or why the amounts claimed are other than speculative.

### 3.    Respondent's Position and Expert Reports

Respondent maintains the legal requirements for an award of lost earnings remain unmet. In support of this contention, Respondent has submitted two expert reports from Patrick Kennedy, Ph.D. Exs. A, C. Dr. Kennedy is an economist with a doctorate in Economics earned from Stanford University in 1992. Ex. A at 1; Ex. A, Tab 1. He has over 20 years of experience, serving as an expert in the United States Court of Federal Claims, other federal and state courts, and in private arbitrations nationwide. Ex. A, Tab 1. Dr. Kennedy analyses economic loss and damages in a wide range of legal actions. *Id.*

Dr. Kennedy opines that that "the damages being claimed by Ms. Moreland and quantified by Ms. Schleede are not supported by medical evidence of impairment or financial documentation." Ex. A at 6. As such, Dr. Kennedy concludes that Petitioner's "claim [for lost wages] is speculative and should not be relied upon." Ex. A at 6; Ex. C. at 2.

In support of his opinion, Dr. Kennedy observes that Ms. Schleede merely "accepted Ms. Moreland's representations regarding her economic losses. It does not appear that Ms. Schleede did any work to substantiate the [Ms. Moreland's] representations." Ex. A at 4. Dr. Kennedy then independently reviewed the three categories of lost wages damages sought by Petitioner, but was unable (based upon the

evidence provided by Petitioner) to ascertain if any of the purported lost earnings were substantiated. *See e.g.*, Ex. A; Ex. C. Dr. Kennedy also notes that he requested documentation from Petitioner that he deemed necessary to support any lost earnings analysis, before and concurrent with his first report, but never received the information requested. Ex. A at 2, 6; Ex. C at 1-2.

### C. Analysis of Lost Earnings Damages Request

Petitioner has failed to substantiate her alleged earnings losses by preponderant evidence. I will discuss each aspect of this damages element below, as well as overarching deficiencies in the proof offered to support this element that prevent its award to any extent.

### 1.    Lost Income From "House Flipping"

Petitioner asserts that after completing one house "flip" in 2016, earning $7,000.00 as her share of the profits, her company (MotherFlipper Realty) was "on track" to resell three more houses in 2018, with twice as many likely in 2019, representing a pre-tax loss of $21,000.00 in 2018, and $42,000.00 in 2019. ECF No. 58; Ex. 20 ¶¶ 4, 6. As evidence that this was likely, she asserts that she set aside $120,000.00 for down payments and renovation costs (for the anticipated house resales), and that she and her mother had visited several properties in anticipation of purchasing them. Ex. 26 ¶3.

Insufficient substantiation, however, has been provided that would permit me to conclude that the lost resale earnings were anything other than hoped for, and thus speculative (as opposed to a business venture that could be counted upon to occur but for the SIRVA). For example, Petitioner did not file any documentation corroborating the savings purportedly set aside for the planned house purchases, evidence of time spent researching or visiting them, or anticipated contracts with prospective buyers. At most, she has filed quitclaim deeds establishing that between December 2020 and August 2021, MotherFlippers Realty acquired three rental properties. Ex. 27; Ex. 26 ¶4. But this evidence does not demonstrate that Petitioner had the capital in 2018 and 2019 to purchase a total of nine houses to resell – or was otherwise likely to engage in such transactions at all. The deeds may be relevant to her rental business income claims, but less so to the assertion of lost opportunities to sell houses. At most, this could be evidence of Petitioner shifting her business focus away from property resale – but again, to obtain the lost returns that Petitioner expected to achieve, more firm evidence that this expectation was grounded in reality was required.

In addition, Petitioner asserts that the home resale market in 2018 and 2019 was profitable, "and [in 2019] was up '2 percent increase from 2018, to the highest point since 2006,'" and "that the data shows in 2019, home flippers, 'took an average of 178 days to complete flips . . . .'", and that the "total number of home flips by investors in the fourth

quarter of 2019, 'resulted in a ratio of 2.36 flips per investor." Motion at 5-6 (citations to internet sources omitted). She also invokes her experience as a licensed practicing realtor in Springfield, Massachusetts (a suburb approximately 80 miles outside Boston), noting that the metro area was a "very hot real estate market," and that "many of the home flippers" Petitioner was aware of "flipped anywhere from 2 to 12 houses in any given year." Ex. 20 ¶¶1, 3; Petitioner's Motion at 6 (citing Ex. 20, Petitioner's affidavit). But such evidence does not substantiate that *Petitioner* was likely to benefit from this otherwise-profitable business. Rather, it demonstrates that the market for "flipping" was good at the time.

Significantly, Petitioner has provided no documentation evidencing her purported $7,000.00 profit from her 2016 house resale. In fact, Petitioner's 2016 tax documents demonstrate that she sustained a *loss* in 2016 related to Moreland Realty. Ex. 17 at 31, 34**.** Petitioner attributes this loss to the purchase of a second property in November 2016 (that was renovated but not rented out until October 2017), but this explanation does not substantiate the purported single resale profit that would provide *some* substantiation for her intended resale business. Ex. 26 ¶2.

Otherwise, Petitioner has not demonstrated (through her own statements or the work of her expert) that the $63,000.00 in alleged house flipping business losses for 2018-19 was calculated "in accordance with generally recognized actuarial principles and projections" as required by Section 15(a)(3)(A).[11] Ms. Schleede's only analysis is regarding the tax implications of Petitioner's purported income loss. She may have calculated that accurately – but the purported underlying loss *itself* has not been adequately substantiated.

Thus, the evidence submitted by Petitioner does not preponderantly substantiate her assertions that but for her vaccine injury she would have flipped a total of nine houses in 2018 and 2019, for pre-tax earnings of $63,000.00. This requested component is simply too speculative to be awarded, given the standards applied in calculating Vaccine Act damages. Accordingly, it is denied.

## 2. Lost income from Rental Property Business

Petitioner next seeks lost income related to rental investment property she planned to purchase, but purportedly could not as a result of her injury. Specifically, Petitioner

---

[11] Additionally, Respondent has submitted evidence of apparent social media posts, from a Facebook account identified as "Brittany Moreland Realty and Investments," that appear to demonstrate that the second property purchased by Moreland Realty in November 2016 was initially listed for resale, and not as a rental property. ECF No. 76 at 2 (citing Ex. D and realtor.com). However, Respondent argues that based on data from the websites realtor.com and Zillow.com, Moreland Realty was in fact unable to sell that house in 2017, despite four reductions in price, and therefore elected to remove the listing and market the house as a rental. *Id.* at 3 (internet cites omitted). Accordingly, this underscores "that there was no guarantee that petitioner would make any profit from her house flipping ventures." *Id.*

asserts that she "secured" one property to manage in 2017, and would have acquired an additional property in 2018, plus two more in 2019, but for her vaccine injury. ECF No. 58, Ex. 16 at ¶6. She calculates that each additional rental property would have produced income to her of $1,800.00 per year,[12] and thus her claimed lost rental income for 2018 was $1,800.00, doubling to $3,600.00 for 2019. ECF No. 58.

As a preliminary matter, it is not clear if Petitioner's alleged lost income related to rental property income stems from losses incurred by MotherFlipper Realty LLC (formerly Moreland Realty, LLC), of which she is a 50 percent owner, or MotherFlippers Management LLC, of which Petitioner is the sole owner. Ex. 26 ¶4. Petitioner indicates in her third supplemental affidavit that MotherFlippers Management was only initiated in October 1, 2018. *Id*. This discrepancy bears on whether the claimed lost rental income for certain years (assuming it is otherwise recoverable) has been over-estimated. Petitioner states that she and her mother purchased a property in November 2016 that they subsequently renovated and rented out in October 2017. Ex. 20 ¶7. Presumptively this property was owned by MotherFlipper Realty (formerly Moreland Realty). Petitioner states that "[w]e then did not purchase our second rental property, due to pain and physical therapy, until the end of 2019 and it was ready for occupancy in early 2020." *Id*.

Other questions arise with respect to the scope of this aspect of Petitioner's business. Petitioner has represented that MotherFlippers Realty "switched to a company that focuses on acquisition of rental properties" because of her "injury and inability to perform the work I needed to keep [house flipping] costs down." Ex. 26 ¶4(b). As of October 2021, MotherFlippers Realty owned a total of five properties. *Id.* Petitioner has filed the property deeds for the three properties purchased in December 2020, January 2021, and August 2021. Ex. 27. However, Petitioner has provided no *specific* evidence of her rental income for these five properties that could corroborate her claimed losses for rental acquisition opportunities that her injury forced her to forego. Petitioner has filed lease agreements executed in 2021 concerning some of these properties, but they do not detail specifically how much income, or profit, she earned from these properties. Ex. 25 at 8-12, 30-39.

Additionally, Petitioner represents that she "began focusing on [her] services as a property manager and learning more about landlord/tenant laws." Ex. 20, ¶7. Petitioner thus started a *new* business in 2018 (not involving her mother), MotherFlippers Management, which manages properties for which Petitioner herself acts as "property manager." Ex. 20, ¶7; Ex. 26 at ¶4(c). Petitioner asserts that, as of October 2021, she was managing 44 units through MotherFlippers Management, which produce total fee income of approximately $3,830.00 per month. Ex. 26 at ¶4(c). Petitioner has filed eight

---

[12] These figures Petitioner asserts, in her 2019 narrative, are based on a "low end of $150 a month since that is my portion of profit from my current rental." ECF No. 58.

lease agreements, all executed in 2021, involving MotherFlippers Management. Ex. 25 at 1-7, 13-29, 40-49. But Petitioner has filed no *evidence* (other than the allegations in her third supplemental affidavit) to confirm this monthly income. Importantly, MotherFlippers Management did not exist prior to Petitioner's vaccine injury (*i.e.*, at the time she anticipated acquiring one additional rental property in 2018, and another two properties in 2019), and further appears to be a distinct business relating to managing properties owned by other individuals, as opposed to renting out property owned by her own business.

Regardless of whether this income was lost from MotherFlippers Realty or MotherFlippers Management, Petitioner has more fundamentally failed to explain *how* the evidence she filed demonstrates that but for her vaccine injury she would have made the claimed amounts of lost income on rental property. In effect, these "missed opportunities" seem reflective of Petitioner's pre-injury *aspirations* – but they have not been substantiated as planned and likely acquisitions that her SIRVA prevented. While she has substantiated the existence of rental properties she has owned and/or managed as part of her more recent business activity,[13] this showing does not help establish that the purportedly lost rental opportunities in prior years reflected any more than a speculative hope.

Petitioner's expert's input on this question (again) only established what the tax offset would be if the purported loss is accepted as correct – not whether the purported losses were realistic. I thus find that the lost rental income component of this damages element has not been sufficiently substantiated.

### 3.   Lost Income from Real Estate Commissions

The third sub-component of Petitioner's lost earnings claim seeks $12,895.00 in real estate commissions she represents were foregone in 2018. ECF No. 58. To substantiate this amount, Petitioner begins with a summary of her total commission income from 2015-20, as calculated by Ms. Schleede, purportedly demonstrating (as mentioned above) that her work as an agent generated income of varying amounts year

---

[13] Petitioner has filed no evidence (outside statements in her affidavits), however, establishing how much income or profit she has in fact earned from the five properties acquired and owned by MotherFlipper Realty (formerly Moreland Realty) between 2016 and 2021. In fact, a review of Petitioner's tax filings from 2016 to 2020 indicates that Petitioner never reported positive income from either entity. *See e.g.*, Exs. 17, 22.

to year.[14] But her SIRVA injury "greatly limited" her activities in 2018, and thus she earned only $9,677.00[15] from her residential real estate sales. ECF No. 58.

To provide a baseline for commission earnings, Petitioner has submitted her tax returns from 2015 through 2020, as well as check stubs and invoices from Kushner Realty for 2019. Exs. 17-19, 22-24. Her 2019 lost wages narrative then sets forth the basis for her calculation of lost commissions. ECF No. 58.  She averaged her year-to-date earnings of $23,770.87 in commissions [apparently for 2019] with her 2016 earnings of $22,570.00 in real estate commissions. *Id.*

Dr. Kennedy, however, was unable to recreate that figure using the method described by Petitioner. Ex. 21 at 4. He also observed in his report that Petitioner did not take into account her 2015 or 2017 commission earnings (which were also diminished, even though Petitioner's SIRVA did not occur until October 16, 2017) when calculating her alleged 2018 lost commissions. *Id.* Petitioner has attempted to explain these lesser earning years, maintaining that 2017 was the result of "family issues" after the death of three grandparents, and that she did not "really start working" until 2016. ECF No. 58.

Unfortunately, I cannot find that this element of the total lost earnings claim has been sufficiently substantiated. While the variable speculative nature of amounts a person might earn from commissions on the sale of houses when acting as an agent is inherently less than anticipated business profits of the kinds Petitioner has also demanded, *any* lost earnings requested in a Vaccine Act case must be reasonable, and corroborated by evidence. A claimant who seeks to show earnings not paid during a time she could not

---

[14] Ms. Schleede summarizes in her report Ms. Moreland's commission income (before offsets for related business expenses) for 2015-2020 as follows:

> 2015 $4,986 (2015 1040 Schedule C-EZ);
>
> 2016 $23,825 (2016 1040 Schedule C-EZ);
>
> 2017 $7,834 (2017 1040 Schedule C-EZ);
>
> 2018 $9,926 (2018 1040 Schedule C);
>
> 2019 $31,906 (2019 1040 Schedule C); and
>
> 2020 $57,363 (2020 1040 Schedule C).

Ex. 21 at 1.

[15] This calculation of $9,677.00 actually appears to be Petitioner's 2018 business income (Ex. 17 at 98) comprised of realtor income after offsets of $8,912.00 (Ex. 17 at 100) plus property management income from MotherFlippers Management of $765.00 (Ex. 17 at 102). Petitioner also reported an income loss of $7,354.00 from MotherFlippers Realty in 2018. Ex. 17 at 103.

work due to a vaccine injury must establish a basis for expecting that the sum would otherwise have been obtained.[16]

What kind of showing has been made here? Petitioner has pointed to no specific listings, or sales, that she maintains were lost in 2018 as a result of her injury. At most, there is a difference between what she earned in 2018 (when Petitioner was dealing with what has been established to be a relatively mild SIRVA) and the following years, or as compared to 2016, before her injury. But it is speculative to assume on this record that any such differential was due to the SIRVA injury, especially given the variability in commissions Petitioner earned over several years. To find otherwise, I would need to have been provided some evidence of either (a) more invasive treatment that prevented Petitioner from working, (b) reliable third party, or expert, corroboration that Petitioner's work load was by necessity diminished, or (c) listings that Petitioner can show were foregone due to her injury. That evidence was not provided – despite ample opportunity to do so.

It is certainly conceivable that a person so injured might see a diminution in her commissions income while suffering from a SIRVA. It was for this reason that I permitted reconsideration. But I cannot find on this record that the claimed amounts were substantiated. Petitioner has otherwise failed to demonstrate that her alleged lost commission income was calculated in accordance with "generally recognized actuarial evidence and projections," as required by Section 15(a)(3)(A). Once again, Petitioner's expert's input on this question only established what the tax offset would be if the purported loss is accepted as correct – not whether the purported losses were realistic. Thus, this demanded element of lost earnings is as speculative as the prior elements already discussed.

### 4.    Other Deficiencies in Petitioner's Lost Earnings Claim

In addition to the above, Petitioner's lost earnings claim is undermined by a number of overarching factors. These issues remain – despite *more* than a reasonable opportunity to address them.

First, the medical record evidence in this case is not generally supportive of the conclusion that Petitioner's SIRVA symptoms were severe enough to prevent her from doing the kinds of real estate-related work that would have generated the lost earnings she seeks. Her SIRVA did not require intrusive treatment, for example: while she did

---

[16] In a case where a traditionally-employed petitioner has simply missed multiple days of work (at a job for which they are paid a salary), this can be more easily calculated, by considering the wage they would otherwise achieve. But regardless, *any* Program petitioner demanding lost earnings must provide corroboration to assist in the accurate calculation of the sum requested.

engage in physical therapy, these sessions were limited and took place over approximately one month in 2018 and two months in 2019, and clearly were not so time consuming as to have precluded Petitioner from engaging in her real estate endeavors.[17]

I also observe that while Petitioner's medical records document that she suffered shoulder pain and limitations in shoulder strength and movement, they do not establish the existence of any limitations or restrictions placed on Petitioner's ability to engage in work, or athletics. In fact, she was able to play tennis on April 23, 2018, although she reported she was "a little sore" thereafter. Ex. 4 at 20. Further, Petitioner's primary care records from April 12, 2018 indicate that Petitioner reported she was exercising regularly, working in real estate, and taking online classes. Ex. 12 at 7.[18] The record does not allow me to conclude that Petitioner could not accomplish her work-related tasks during the relevant time period, or only at a far lower level.

The above could be addressed by persuasive testimony from a vocational specialist. But Petitioner has not offered such an expert – nor has she pointed to any medical treater who expressed the view that she was unable to work, or placed any health-related restriction on her work or professional endeavors. Reconsideration of my prior denial of this damages element provided her the chance to marshal such support to the extent it was missing from the record, and thereby establish that she "lost the ability to earn revenue from . . . her labor." *Heinzelman v. Secy. of Heath and Hum. Servs.,* 98 Fed. Cl. 808, 816 (2011), *aff'd,* 681 F.3d 1374 (Fed. Cir. 2012). In many vaccine cases, petitioners have turned to vocational experts to establish their inability to work post-vaccination injury at the same level as before. *See, e.g.*, *Petronelli v. Sec'y of Health & Hum. Servs.*, No. 12-285V, 2016 WL 1085455, at *2 (Fed. Cl. Feb. 22, 2016) (discussing opinion from the petitioner's vocational expert that given petitioner's "physical and mental limitations noted in the record, it seemed 'unlikely' that petitioner would be capable of maintaining gainful employment on either a part-time or full-time basis."). No such evidence has been offered.

Second, I do not find that Petitioner's witness statements or wage loss narrative fill in these evidentiary gaps. These statements helped establish the nature and contours of

---

[17] Petitioner completed eight physical therapy sessions between April 3, 2018 and May 1, 2018 (Ex. 4 at 16-23), and 20 sessions between March 14, 2019 and May 7, 2019 (Ex. 9 at 28, Ex. 13 at 13, 15).  Petitioner also engaged in physical therapy during November and December of 2017, after her October 2017 SIRVA injury, but has not requested lost wages for these months.

[18] At most, and as discussed *infra* p. 21, Petitioner's SIRVA symptoms worsened after she suffered a sledding accident in February 2019. While I find that Petitioner had not yet then recovered from her SIRVA, it is evidence that her symptoms were aggravated by her sledding accident. *See infra* p. 21. Nonetheless, Petitioner sought no further treatment after May 2019, and I find that her injury was significantly improved at that time. *See infra.* pp. 20-21.

her lost earnings claim – but they were not corroborated with sufficient independent evidence to accept the contentions they contained. Affidavits from petitioners are most helpful when they support, elaborate upon, or buttress otherwise unclear medical records and/or other evidence. Petitioner has filed no evidence, aside from her own statements, demonstrating that she was unable to work as a result of her SIRVA.

### D.    Conclusion on Lost Earnings

As I discussed at the Motions Day hearing in this matter, the assertion that Petitioner's SIRVA could have negatively impacted her professional endeavors as a realtor and real estate investor had a foundational plausibility. It was for that reason that I proposed to give her the opportunity to substantiate this damages element – rather than simply deny it outright when ruling on other components she had sought (although I did initially deny it at the time due to its deficiencies). Transcript of Proceedings filed June 17, 2021, ECF No. 62, pp. 3-5.  Petitioner needed to accomplish this by offering sufficient evidence to meet the Program's preponderant standard of proof.

Petitioner, however, has failed to provide evidence establishing that her "earning capacity is or has been impaired by reason of . . . [her] vaccine injury" as required by Section 15(a)(3)(A). Rather, her calculations were rooted in speculation about her incipient earning *goals* or *hopes* – not in "generally recognized actuarial evidence and projections," as required by Section 15(a)(3)(A). Even when asked for substantiating proof by Respondent, she chose to rest on the record as it stood, despite my warnings.[19] And although she was given the opportunity to employ an expert to assist her in the required showing, that expert only provided tax calculations based on assumptions about the underlying accuracy of the claimed losses – and thus offered no analysis to explain how the sums sought by Petitioner were objectively reasonable.

Accordingly, because the record lacks preponderant support for an award of lost wages/earnings in this case, no such award will be permitted.

---

[19] In addressing, Respondent's raised concerns that his expert could not properly evaluate this claim without the information sought, I warned Petitioner:

> While I have some sympathy for Respondent's concerns that his expert still lacks sufficient information to adequately respond to the damages demand, the ramifications of such omissions ultimately fall on Petitioner. If she does not deem it necessary to respond in detail to Respondent's request, and/or in a timely fashion, she incurs the risk that I will find (again) that she has not carried her burden of proof on this issue.

ECF No. 71. Despite this warning, Petitioner declined to obtain and file the information sought by Respondent.

### III.   Pain and Suffering

#### A.  Legal Standard and Prior SIRVA Pain and Suffering Awards

In another recent decision, I have discussed at length the legal standard to be considered in determining damages (including out-of-pocket losses as well as pain and suffering) and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Sections II and III of *Friberg v. Sec'y of Health & Hum. Servs.,* No. 19-1727V, 2022 WL 3152827 (Fed. Cl. July 6, 2022).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[20]

#### B.  Appropriate Compensation for Petitioner's Pain and Suffering

In this case, Petitioner's awareness of the injury is not disputed, leaving only the severity and duration of that injury to be considered. In determining appropriate compensation for Petitioner's pain and suffering, I have carefully reviewed and taken into account the complete record in this case, including, but not limited to: Petitioner's medical records, affidavits, filings, and all assertions made by the parties in written documents and at the expedited hearing held on May 28, 2021. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases, and relied upon my experience adjudicating these cases. However, my determination is ultimately based upon the specific circumstances of this case.

I reject Respondent's argument that the amounts awarded in litigative-risk settlements and proffered cases provide more persuasive guidelines for the award to be issued in this matter than reasoned decisions from the Court and special masters. As I have previously stated, a proffer is simply Respondent's assessment (as agreed to by Petitioner) of the appropriate amount to be awarded, and thus a special master's approval of a proffer is not akin to a reasoned evaluation of damages, issued by a neutral judicial

---

[20] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

officer, that can be looked to when evaluating the damages to be awarded – even if settled[21] cases and proffers do provide some evidence of the magnitude of awards in factually-similar actions.

Pursuant to my oral ruling on May 28, 2021 (which is fully adopted herein), **I find that $75,000.00 represents a fair and appropriate amount of compensation for Petitioner's past pain and suffering. I further find that Petitioner has not established by a preponderance of the evidence entitlement to an award for future pain and suffering.**

First, Petitioner's shoulder pain was significant enough to prompt her to seek treatment on November 6, 2017, approximately three weeks after her October 16, 2017 flu vaccination. Ex. 1 at 1, Ex. 2 at 3. Thereafter, she underwent treatment for her injury for approximately 18 months, to include: physical therapy,[22] an MRI scan,[23] and steroid injections.[24]

Second, Petitioner's medical records establish that she suffered on balance a low to moderately severe injury. Petitioner's reported pain levels fluctuated over time. She began physical therapy on November 13, 2017 and reported a pain of 5/10 (at rest) and 8/10 (with activity). Ex. 3 at 38. Although, she was assessed with no significant improvements from her physical therapy on December 29, 2017, she did report a reduced pain level of 3/10 at rest, and 6/10 with activity. *Id.* at 6. She reported the same pain levels on April 3, 2018, Ex. 4 at 18, and reported a pain level of 4/10 on April 23, 2018 – noting she "played tennis this morning and is a little sore," Ex. 4 at 20. While Petitioner reported continued shoulder pain to her primary care provider on April 12, 2018, she also reported that she was exercising regularly, working in real estate, and taking on-line classes. Ex. 12 at 7, 9. On May 5, 2018, she had nearly full range of motion, but presented with a

---

[21] However, I note that cases resolved via litigative-risk settlement are less instructive than even proffered cases, as these cases involve a negotiated settlement between the parties' reflecting the inherent risk in proceeding to a hearing on entitlement to compensation in a case where Respondent has not conceded compensation.

[22] Petitioner engaged in three rounds of physical therapy completing 15 sessions between November 13, 2017 and December 29, 2017 (Ex. 3 at 6), 8 sessions between April 3, 2018 and May 1, 2018 (Ex. 4 at 16-23), and 20 sessions between March 14, 2019 and May 7, 2019 (Ex. 9 at 28, Ex. 13 at 13, 15).

[23] Petitioner's left shoulder MRI scan on October 11, 2018 was found to be normal. Ex. 6 at 1-2. Petitioner also underwent a cervical spine MRI on March 19, 2019. Ex. 12 at 21.

[24] Petitioner received three steroid injections to treat her shoulder pain on May 10, 2018 (Ex. 4 at 13), April 11, 2019 (Ex. 11 at 4), and April 23, 2019 (Ex. 11 at 6). Petitioner also underwent a diagnostic injection on April 11, 2019 to the left subacromial space (consisting of 5mL lidocaine 1% plain combined with 5mL 0.25% bupivacaine). Ex. 11 at 3.

"[p]ositive impingement arc with positive impingement signs," and received a steroid injection. Ex. 4 at 13.

Petitioner next sought treatment for her shoulder five months later, on October 4, 2018, as her shoulder pain "generated from [her] flu shot" a year prior continued and the treatment injection provided only a few weeks of pain relief. Ex. 10 at 1. Petitioner's orthopedist determined that Petitioner should "obtain an MRI to see if there is any true pathology to the shoulder versus potential role for referral to pain management." *Id.* Petitioner's left shoulder MRI was conducted on October 11, 2018 and was normal. Ex. 6 at 1-2. At Petitioner's follow-up orthopedic appointment on November 8, 2018, her orthopedist assessed "persistent and refractory left shoulder pain secondary to previous flu shot. With *normal clinical and diagnostic testing*." Ex. 10 at 5 (emphasis added). Petitioner was referred to "pain management for non-orthopedic treatment of her persistent shoulder pain." Ex. 10 at 5.

However, in February 2019, Petitioner's shoulder pain worsened. On February 25, 2019, Petitioner was seen at her primary care provider for a chief complaint of left shoulder pain. Petitioner's post-vaccination history of shoulder pain and treatment is detailed in this record, including that she was last seen for her shoulder in October 2018 and that her shoulder pain had persisted since then Ex. 12 at 17. The record further indicates that Petitioner "injured it [her shoulder] last week sledding – [had] some swelling – which is better since then" and was treated at MedExpress[25] and given NSAIDs. *Id.* Petitioner reported a "normal pain level now" of "3-5/10" and it was noted she has "limited ROM still since 10/2017." *Id.* A physical exam demonstrated appropriate range of motion, but mild tenderness. Ex. 12 at 19. Petitioner's primary care provider documented "[l]eft shoulder pain – acute on chronic pain after recent injury while sledding. She thinks she put her hand down and may have hyperextended her shoulder. The swelling and pain [are] much better since then.? Strain on top of more chronic issue . . . ." *Id.*

Thereafter, Petitioner treated for her left shoulder pain for another three months, engaging in another round of physical therapy and seeking treatment from a new orthopedist. At her physical therapy initial evaluation on March 14, 2019, Petitioner complained of "limited mobility - left scapula and upper arm pain down to elbow with numbness, pins and needles in left hand." Ex. 9 at 29. On examination she exhibited decreased ROM, weakness, and positive impingement syndrome. *Id.* Petitioner underwent a cervical MRI on March 19, 2019, to "evaluate her chronic left shoulder pain," Ex. 12 at 21, which her new orthopedist found "not impressive," Ex. 11 at 4.

---

[25] Records from a MedExpress visit on February 18, 2019 were filed evidencing a complaint of left shoulder pain, her post vaccination history of pain, but without discussion of the sledding event. Ex. 14 at 11.

Petitioner's orthopedist initially assessed her with a likely subacromial impingement, but then ruled that diagnosis out after she did not respond to diagnostic injection in the subacromial space on April 11, 2019. Ex. 11 at 3-4. Instead her orthopedist determined that he would treat for adhesive capsulitis, administered a steroid injection, and recommended more physical therapy. *Id.* at 4. Petitioner received another steroid injection on April 23, 2019, for "[l]eft shoulder pain secondary to osteoarthritis/persistent pain post vaccination." Ex. 11 at 6. Petitioner's last treatment record is from May 7, 2019, when she was discharged for her third and final round of physical therapy after 20 sessions. Ex. 13 at 13, 15. Petitioner indicated that although "[t]he cortisone shot did not do much. I still feel much better." *Id.* at 13. Her pain levels were 3/10 with activity and 2/10 at rest. *Id.* It was noted that she "continues to present with impairments involving ROM, Soft Tissue Mobility, Flexibility, Pain, [and] Joint Mobility." *Id.* Her deficits caused limitations in her abilities to perform these tasks: cleaning (dusting, washing, lifting overhead), sleeping, and styling/washing her hair. *Id.* Petitioner's physical therapist found that she had "[r]eached maximum benefit from therapy" and she was discharged. *Id.*

While Petitioner had not yet completely recovered from her shoulder injury, at that point on May 7, 2019 (nearly a year and seven months after her vaccination), I find that her SIRVA and related sequela had significantly improved. No further treatment records have been filed.

In making my determination, I have fully considered and taken into account Petitioner's sworn affidavits, which evidence the pain experienced by Petitioner over the course of her injury, as well as the limitations in her ability to sleep, be active with her young children, and participate in some physical hobbies (such as disc golf, tennis, pool, and working out) as a result of her shoulder injury. Exs. 5, 16.

I have also taken into consideration the impact Petitioner believes her SIRVA had on her enjoyment of or enthusiasm for her professional endeavors (independent of the fact that I have *not* found Petitioner successfully substantiated that this impact translated into any calculatable lost earnings). The impact on Petitioner's enjoyment of her work, and enthusiasm in its pursuit, is a relevant factor herein in calculating pain and suffering awards generally. However, I do not make a further upward adjustment, as Petitioner argues I should, for these factors based upon Petitioner's Motion for Reconsideration and evidence filed in support thereof. ECF No. 75 at 3, 15. It simply has not been shown that Petitioner's *overall* ability to work was so hampered that a higher pain and suffering award for an otherwise-mild SIRVA is justified.

While Petitioner's affidavits and medical records establish that she experienced subsequent shoulder pain and limitations, I find that her SIRVA, and her associated pain and suffering, was significantly improved at the time of her discharge from physical

therapy on May 7, 2019, as described above. Further, although Petitioner has demonstrated that she suffered residual and persisting symptoms of her SIRVA after her May 7, 2019 discharge, she has failed to establish she suffered a permanent injury, or disability, or is otherwise entitled to damages for future pain and suffering.

Respondent argues that Petitioner has only established the "symptomology" of her SIRVA through her May 10, 2018 orthopedist appointment and second steroid injection. ECF No. 55 at 17. I disagree. While it is evident from the record that Petitioner's SIRVA symptoms at that time had improved, and her subsequent shoulder MRI on October 11, 2018 was normal, it is clear Petitioner continued to experience some shoulder pain and limitations, even if an orthopedic explanation for her pain could not be offered.

Respondent further argues that Petitioner's shoulder symptoms became worse, and different, subsequent to the February 2019 sledding incident, noting that Petitioner did not report the sledding incident to her physical therapist or orthopedist, and therefore these treaters did not have an opportunity to evaluate the impact of that injury. On this issue, I concur with Respondent that Petitioner's complaints and symptoms appear to have worsened, and that they somewhat changed or evolved subsequent to February 2019. ECF No. 55 at 19-20. However, I do not believe it is possible to parse out Petitioner's shoulder pain and suffering related to the sledding injury in February 2019, from her pre-existing SIRVA (which Respondent has conceded she suffered). Thus, I agree with Petitioner and find that (based on my experience evaluating SIRVA claims) SIRVA is not a static or monophasic injury, but one where symptoms and associated pain and suffering therefrom do ebb and flow. Accordingly, the sledding incident in February 2019 likely contributed, and added, to Petitioner's pre-existing shoulder pain and symptoms related to her existing SIRVA.

I also find that Petitioner's normal shoulder MRI is a factor against a finding of a more severe injury and thus a higher pain and suffering award. Likewise, I find the fact that Petitioner's injury was not so severe as to require that she undergo even arthroscopic shoulder surgery, preponderates in favor of a less severe shoulder injury.

Petitioner argues that her case is comparable to two non-surgical SIRVA decisions, *Binnette* and *Dawson-Savard*,[26] but I find the injury experienced here was

---

[26] *Binette v. Sec'y of Health & Hum. Servs.*, No. 16-0731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (ruling determining an appropriate award to be $130,000.00 for actual pain and suffering and $1,000.00 per year for projected pain and suffering); *Dawson-Savard v. Sec'y of Health & Hum. Servs.*, No. 17-1238V, 2020 WL 4719291 (Fed. Cl. Spec. Mstr. July 14, 2020) (ruling determining an appropriate award to be $130,000.00 for actual pain and suffering and $500.00 per year for projected pain and suffering). Petitioner also offers *Cooper v. Sec'y Health & Hum. Servs.*, No. 16-1387V, 2018 WL 6288181 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for actual pain and suffering) as a comparable case, but alleges that her injury was more severe. However, I note that the *Cooper* petitioner remained in physical therapy over two years after the date of her injurious vaccination. *Id.*, at *12.

milder. Petitioner's treaters, unlike those in *Binnette* and *Dawson-Savard*, made no finding that her injury is permanent. Further, the *Binette* and *Dawson-Savard* petitioners' diagnostic testing (MRI and ultrasound, respectively) had objective findings of shoulder impairment. Ms. Dawson-Savard received over 13 injections to treat her pain. *Dawson-Savard,* 2020 WL 4719291, at *3. Finally, these cases involved no intervening injury contributing to the petitioners' shoulder symptoms and pain and suffering therefrom.

Rather, I find this case is more comparable to the cases cited by Respondent, *Rayborn, Ramos,* and *Knauss*, in addition to another case, *Dagen*.[27] However, I find that Petitioner's injury in the instant case was more severe than the injuries suffered by the petitioners in the aforementioned cases, and accordingly award a higher award for her actual pain and suffering.

## IV.    Conclusion

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $75,000.00, representing compensation for her actual pain and suffering.** This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.[28]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[27] *Rayborn v. Sec'y Health & Hum. Servs.,* No. 18-0226V, 2020 WL 5522948 (Fed. Cl. Spec. Mstr. Aug. 14, 2020) (awarding $55,000.00 for actual pain and suffering); *Ramos v. Sec'y Health & Human Servs.*, No. 18-1005V, 2021 WL 688576 (Fed. Cl. Spec. Mstr. Jan. 4, 2021) (awarding $40,000.00 for actual pain and suffering); *Knauss v. Sec'y Health & Hum. Servs.*, No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018) (awarding $60,000.00 for actual pain and suffering); and *Dagen v. Sec'y of Health & Hum. Servs.*, No. 18-0442V, 2019 WL 7187335 (Fed. Cl. Spec. Mstr. Nov. 6, 2019) (awarding $65,000.00 for actual pain and suffering).

[28] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.